IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TANYA SARACCO *ex rel.* T.H., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15 C 6208 |
| v. | ) | |
| | ) | |
| NANCY BERRYHILL, Acting | ) | Magistrate Judge |
| Commissioner Social Security,[1] | ) | Maria Valdez |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Tanya Saracco seeks review of the final decision of the

Commissioner of Social Security denying her application for childhood supplemental

security income ("SSI") on behalf of her minor child T.H. under Title XVI of the

Social Security Act.  The parties consented to the jurisdiction of the United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, and Plaintiff

filed a motion for summary judgment.  For the reasons stated below, Plaintiff's

motion is granted in part and denied in part, and the matter is remanded to the

Commissioner for further proceedings.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for SSI on December 31, 2011, alleging a

disability onset date for T.H. of August 13, 2004.  (R. 64-65, 73.)  After an initial

denial and a denial on reconsideration, Administrative Law Judge ("ALJ") Patrick

---

[1] Nancy A. Berryhill has been substituted for her predecessor pursuant to Federal Rule of
Civil Procedure 25(d).

1

Nagle held an administrative hearing on October 18, 2013.  (R. 47-63.)  Plaintiff

appeared and testified after waiving her right to be represented by counsel.  On

November 12, 2013, the ALJ issued a written decision denying Plaintiff's

application for SSI.  (R. 27-42.)  The Appeals Council initially denied review on

September 3, 2014.  (R. 17-19.)  Plaintiff then obtained counsel and submitted

additional evidence to the Appeals Council, which set aside its earlier action only to

deny review once again on May 26, 2015.  (R. 1-7.)  The ALJ's decision therefore

became the Commissioner's final decision, and Plaintiff seeks review in this Court

pursuant to 42 U.S.C. § 405(g).

## II.    FACTUAL BACKGROUND

### A.    School and Medical Records

T.H. was six years old at the time that Plaintiff filed her application for SSI

benefits, claiming that T.H. had been disabled since her birth on August 13, 2004

due to attention deficit/hyperactivity disorder ("ADHD") and a learning disability.

The earliest entry in the sparse administrative record is a February 16, 2010 report

by consulting psychologist Dr. Mark Langgut.  (R. 158-61.)  T.H. was five years old

at the time of the examination.  Dr. Langgut noted that she displayed normal affect,

spoke clearly if somewhat slowly, and was friendly and playful.  T.H. required

prompts to count to ten and responded to questions in a manner that led Dr.

Langgut to conclude that her judgment skills were not age-appropriate.  After

applying the Wechsler Preschool and Primary Scale of Intelligence, Dr. Langgut

concluded that T.H. had a full-scale IQ of 77, placing her in the borderline range of

intelligence.  She had an average ability in the area of verbal reasoning and vocabulary, but T.H. was "relatively impaired" in visual-constructive skills, in her level of acquired information, and in her ability to engage in visually-based learning tasks.  (R. 160.)  Dr. Langgut diagnosed borderline intellectual functioning.  (R. 161.)  However, he did not believe that T.H. suffered from ADHD at the time of the 2010 consultation.

On February 16, 2012, Plaintiff consulted T.H.'s primary care physician Dr. Monet Laguerre concerning T.H.'s problems in paying attention.  Plaintiff told Dr. Laguerre that T.H. could not complete her tasks appropriately and that she had recently failed unspecified tests at school.  (R. 162.)  Shortly after that meeting, Dr. Langgut re-examined T.H. on February 23, 2012 and issued a second report on February 29, 2012.  (R. 166-70.)  He noted that T.H. was inattentive at school, was earning D's and F's in her second-grade classes, and that an Individual Educational Plan ("IEP") was being developed for her at the time of the interview.[2]  (R. 167.)  Dr. Langgut noted that T.H. had few friends at school or in her neighborhood and maintained poor relationships with her siblings.  She was not currently taking any medication.  T.H. showed a moderately heightened activity level during her interview with the psychologist.  Unlike in 2010, however, her judgment skills were now normal for a seven year-old child.  (R. 168.)  Dr. Langgut once again assessed T.H.'s intellectual functioning by applying the Wechsler Intelligence Scale for

---

[2]  An IEP is formulated under the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401 *et seq.*, to determine what services are required for students who qualify for special education.  *See Todd v. Duneland Sch. Corp.*, 299 F.3d 899, 905-06 (7th Cir. 2002). The plan is devised by the child's parents, teachers, and other school representatives.  20 U.S.C. § 1414(d)(1)(B).

Children.  He determined that her IQ had decreased to 68 since 2010, placing her in the "extremely low range" of intelligence.  (R. 169.)  Her scores for verbal comprehension, perceptual reasoning, memory, and processing speed were all borderline.  Dr. Langgut again concluded that T.H. suffered from mentally deficient intellectual functioning.  Unlike in 2010, he also determined that she now suffered from ADHD.  (R. 170.)

On March 12, 2012, the Horatio May Elementary Academy issued an IEP for T.H.  The plan states that T.H. required "constant" oversight and redirection, needed help with phonemic awareness, and should receive individual attention to help with her math skills.  (R. 176.)  She ranked in the twenty-second percentile range for reading and in the lowest one percent for math.  Accordingly, various accommodations were provided to T.H. concerning language arts, math, biology, and social sciences.  These included walking by her desk every five minutes to check for accuracy, extending the time to complete tasks by 25 percent compared to other children, and providing T.H. an additional 20 percent of time to finish homework assignments.  (R. 179-80.)  Most of these services were provided in regular classes; the only non-mainstreamed class involved 300 minutes of specialized instruction for math.  In total, the IEP required 300 minutes of separate classwork for math, and 860 minutes of services in regular classes for language arts, biology, and social sciences.  (R. 192.)  That meant that only 17 percent of T.H.'s total school time was to take place outside of regular class settings.  (*Id.*)

On March 20, 2012 state-agency expert Dr. Richard Hamersma issued a childhood disability evaluation form concerning T.H. for the Social Security Administration. As stated below, Dr. Hamersma was required under the regulations to assess T.H.'s functioning in six domains of functioning. He concluded that she had a marked restriction in her ability to acquire and use information. Less than marked limitations were present in the domains of attending and completing tasks, interacting with others, and caring for herself. No limitations were present in T.H.'s ability to move about and manipulate objects or in her health and physical well-being. (R. 199-200.) Dr. Hamersma therefore concluded that T.H.'s impairments of ADHD and deficient intellectual functioning were severe but did not meet, medically equal, or functionally equal a listed disorder. (R. 197.) State-agency expert Dr. Ronald Havens reaffirmed that conclusion on June 17, 2012. (R. 203-09.) After these reports were issued, T.H. was started on the ADHD medication Ritalin on November 15, 2012 at a dosage level of ten milligrams three times daily. (R. 212.) That was doubled to 20 milligrams on March 21, 2013, and the ADHD medication clonidine was added. (R. 214.)

On March 22, 2013 a second IEP was issued for T.H. Plaintiff did not provide a copy of it to the ALJ by the time of the November 2013 decision. Instead, it was submitted for the first time to the Appeals Council after Plaintiff obtained counsel. [Doc. 15, Ex. A.] The IEP states that T.H. struggled to maintain attention during her classes. She had particular difficulties in attending to tasks and in transitioning between subjects and between classes. (*Id*. at 3.) Many of the special

education services that were included in the 2012 IEP were expanded under the new plan. T.H. was now to receive an extra 50 percent in the time allowed for class assignments and homework. (*Id*. at 4.) Seating in a separate area near the teacher was necessary in language arts, math, biology, and social sciences, so that T.H. could receive additional redirection, prompts, and cues. (*Id*. at 4-7.) Contrary to the 2012 IEP, T.H. was also removed from regular class settings for significantly greater parts of each day. She was now to receive 1300 minutes of special education services in separate classes for language arts, math, biology, and social sciences. (*Id*. at 14.) That meant that T.H. would be removed from mainstreamed classes 62 percent of the time in 2013 instead of 17 percent, as provided for under the 2012 IEP. (*Id*.)

### B.   The ALJ's Decision

Following the three-step analytic process described below, the ALJ found on November 12, 2013 that T.H. was not disabled. He concluded at step one that T.H. had not engaged in substantial gainful activity since her application date of December 31, 2011. (R. 30.) T.H.'s severe impairments at step two were ADHD and a learning disorder. (R. 30.) These impairments did not meet or medically equal a listed impairment at step three. (*Id*.) Having determined that, the ALJ then proceeded to decide if T.H.'s impairments functionally equaled a listing by considering T.H.'s six domains of functioning. He found that she had a marked limitation in the domain of acquiring and using information. (R. 37.) A less than marked restriction was present in T.H.'s ability to attend and complete tasks, to

interact with others, and to care for herself.  (R. 37-41.)  No limitations existed in the domains of moving about and manipulating objects or physical health and well-being.  (*Id*.)  The ALJ therefore concluded that T.H. was not disabled.

### III.  <u>LEGAL STANDARD</u>

Prior to 1996, a child was considered disabled if he or she had a physical or mental impairment that was of comparable severity to one that would disable an adult.  42 U.S.C. § 1382c(a)(3)(A) (1994); 20 C.F.R. § 416.924 (1996).  Congress altered this standard under the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA") to require a more stringent showing by a juvenile claimant seeking SSI disability benefits.  *Scott v. Barnhart*, 297 F.3d 589, 594 n.5 (7th Cir. 2002).  A child is considered disabled under the PRWORA standard if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations" for a period of at least twelve months.  42 U.S.C. § 1382c(a)(3)(C)(i); *Harris v. Barnhart*, 231 F. Supp.2d 776, 779-80 (N.D. Ill. 2002).

To determine if such an impairment exists, the Social Security Administration has promulgated regulations that limit the familiar five-step process applicable to adult claimants to three steps.  The ALJ's inquiry asks:  (1) is the child engaged in substantial gainful activity? (2) does the child have a medically determinable impairment that is severe? and, (3) do these impairments meet, medically equal, or functionally equal one of a list of severe impairments set forth in the regulations?  20 C.F.R. § 416.924(b)-(d).  An affirmative answer at step one ends

the analysis, and a child must be found not to be disabled regardless of her age or medical condition. 20 C.F.R. § 416.924(b). A negative answer at step two also requires a finding that the child is not disabled. 20 C.F.R. § 416.924(c).

Unlike the step three requirements applicable to an adult claimant, which refer only to an impairment that "meets or equals" a listing requirement, the regulations state that a child also satisfies the third step when her condition functionally equals an impairment. 20 C.F.R. § 416.924(d). This requirement permits a finding of disability if a child's impairment or combination of impairments result in one of two possible findings. First, the impairments must give rise to "marked" limitations in two of six domains of functioning, including: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. §§ 416.926a(a) & 416.926a(b)(1)(i)-(vi). A limitation is marked if it "interferes seriously" with a child's ability to independently begin, sustain, or finish activities. 20 C.F.R. § 416.926a(e)(2)(i). Such a limitation is "more than moderate" and is equivalent to what one would expect for the functioning level of a child whose standardized test scores are at least two, but less than three, standard deviations below the mean. *Id*.

In the alternative, impairments functionally equal a listed impairment when they constitute an "extreme" limitation in one of the six domains of activity. 20 C.F.R. § 416.926a(a). A limitation is extreme if it "very seriously" interferes with a child's ability to initiate, sustain, or complete activities. 20 C.F.R. §

416.926a(e)(3)(i). An extreme limitation indicates the "worst limitations," though it does not require a complete loss of functioning. It indicates a functioning level expected for a child whose standardized test scores are at least three standard deviations below the mean. *Id*.

## IV.   DISCUSSION

Plaintiff challenges the ALJ's decision on three grounds. She argues that remand is required because: (1) the Appeals Council committed legal error by denying review; (2) the ALJ failed to obtain a proper waiver of representation from Plaintiff and/or did not adequately develop the record; and (3) the ALJ erred in finding that T.H. had less than a marked limitation in her ability to attend to and complete tasks. For the reasons stated below, remand is required on the second and third of Plaintiff's grounds.

### A.   The Appeals Council

Following the ALJ's rejection of her claim, the Appeals Council denied review on September 3, 2014. Plaintiff then obtained counsel, and the Appeals Council informed her that she could submit additional information concerning her claims for T.H. as long as the evidence was "new *and* material to the issues considered in the hearing decision" of the ALJ. (R. 8.) On May 14, 2015, Plaintiff's counsel faxed the 2013 IEP discussed above that Plaintiff did not submit to the ALJ by the time of the administrative hearing. [Doc. 15, Ex. A at 18.] Counsel also submitted a legal brief. The Appeals Council vacated its earlier decision in order to consider counsel's submission and then once again denied review. As is frequently the case, the

Appeals Council attached an exhibit list to its decision to indicate the information it considered. The list identifies counsel's brief but does not mention T.H.'s 2013 IEP. Plaintiff argues that the Appeals Council's failure to consider the IEP was erroneous because it was new evidence that was material to T.H.'s condition.

The regulations obligate the Appeals Council to account only for "new and material evidence" when it decides if a case qualifies for review. 20 C.F.R. § 416.1470. The Court does not address the materiality issue because the 2013 IEP does not constitute new evidence that the Appeals Council was required to consider. Evidence is new under § 405(g) when it was "not in existence or available to the claimant at the time of the administrative hearing." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997); *see also Schmidt v. Barnhart*, 395 F.3d 737, 742-42 (7th Cir. 2005). In this case, T.H.'s IEP was issued on March 22, 2013, and was thus "in existence" by the time of the October 2013 administrative hearing. Plaintiff does not argue that she did know that the school had issued the IEP. *See Bd. of Educ. of Tp. High School Dist. No. 211 v. Ross*, 486 F.3d 267, 274 (7th Cir. 2007) ("Throughout, the statute [IDEA] assures the parents an active and meaningful role in the development or modification of their child's IEP."). Nor does she claim that the report was unavailable to her, or that circumstances prevented her from submitting the IEP to the ALJ in a timely manner. Since the IEP was in existence and available to Plaintiff, it was not new evidence that the Appeals Council was obligated to consider. Plaintiff's motion is denied on this issue.

## B.     <u>Waiver and the ALJ's Development of the Record</u>

Disability claimants have a statutory right to be represented at an administrative hearing, either by an attorney or a non-attorney. 42 U.S.C. § 406(c); 20 C.F.R. § 404.1706. An ALJ must ensure that a *pro se* claimant is aware of her right to representation and, if she chooses to continue *pro se*, that she has validly waived it. An ALJ does so when she explains to the claimant: (1) how an attorney can aid in the proceedings; (2) the possibility of free or contingency-based representation; and (3) that an attorney's fees would be limited to 25 percent of any past-due benefits and that a court would need to approve any fees that may be awarded. *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994). Even if a claimant is represented by counsel, an ALJ still has a duty to develop a full and fair record. *See Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). "This duty is enhanced when a claimant appears without counsel; then the ALJ must scrupulously and conscientiously [ ] probe into, inquire of, and explore for all relevant facts." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) (internal quotes and citation omitted).

Plaintiff appeared at the October 2013 hearing without counsel and without a non-attorney representative. The ALJ told Plaintiff that she might be able to hire an attorney on a contingency-fee basis and that, if she prevailed, the attorney's fees would be limited to 25 percent of any past-due SSI benefits given to T.H. (R. 50.) That satisfied the second and third prongs of the standard for obtaining a valid waiver. Citing *Hull v. Colvin*, No. 11 C 6589, 2013 WL 3771230, at *4 (N.D. Ill. July 17, 2013), Plaintiff argues that the ALJ did not meet the first prong because he did

not inform her how an attorney might help her to pursue her claim on T.H.'s behalf. The Court disagrees. The ALJ in *Hull* told the claimant that he had the right to have counsel present at the hearing but did not explain what an attorney would be able to do to assist the claimant's case. *Id.* at *4. Many courts have found that an ALJ cannot obtain a valid waiver of counsel merely by telling the claimant that she has a right to be represented by an attorney. *See, e.g.*, *Million v. Astrue*, 260 Fed.Appx. 918, 921 (7th Cir. 2008); *Wiszowaty v. Astrue*, 861 F. Supp.2d 924, 936 (N.D. Ind. 2012). But the ALJ in this case went beyond such an inadequate explanation of Plaintiff's right. He told her that "if you were to hire someone, typically what they would do is meet with you before the case, go over the case with you, come to the hearing, sit next to you at the hearing, [and] basically try to help you win your case." (R. 49-50.) It is true that the ALJ could have explained in greater detail the expertise that an experienced attorney could bring to Plaintiff's case, such as assisting with gathering evidence and presenting her claim on T.H.'s behalf in the most favorable light. *See Coleman v. Astrue*, 661 F. Supp. 2d 1016, 1023-24 (S.D. Ind. 2009) (reciting examples of how an attorney can assist a disability claimant). That said, this is not an instance in which the ALJ overlooked the issue altogether or, as in *Hull*, did not mention any of the ways in which an attorney might assist Plaintiff in pursuing her claim. Accordingly, Plaintiff has not shown that the ALJ erred by not obtaining a valid waiver of counsel from her.

Nevertheless, the ALJ was still obligated to ensure that he properly developed the record concerning T.H.'s impairments. The fact that Plaintiff gave a

valid waiver of counsel did not mitigate the ALJ's duty to do so. *See Binion*, 13 F.3d at 245 ("The ALJ has this same duty to develop the record when a plaintiff is without counsel regardless of whether the plaintiff's waiver of counsel was valid."). "Although *pro se* litigants must furnish some medical evidence to support their claim . . . the ALJ is required to supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information." *Nelms*, 553 F.3d at 1098. Plaintiff argues that the ALJ did not comply with this requirement when he did not inquire whether any relevant school records existed other than those that Plaintiff provided.

The Court agrees that the ALJ's failure to inquire into whether additional school records existed concerning T.H.'s current functioning requires remand. Several aspects of the record before the ALJ should have alerted him that additional relevant evidence might exist that Plaintiff had not produced. He knew, for example, that T.H. had received special education services starting in 2012. The ALJ was further aware that T.H.'s March 2012 IEP stated that numerous modifications and specialized conditions that were required under that IEP had already ended as of March 12, 2013, six months prior to the administrative hearing. (R. 182, 184, 186, 188, 190.) The ALJ also knew that T.H. continued to experience serious difficulties at school because Plaintiff told him that T.H. was being removed from certain mainstreamed classes each day for specialized instruction. (R. 60.) Despite that, the ALJ never asked Plaintiff anything about T.H.'s current schooling,

whether she continued to receive special education services, or if a new IEP had been issued. The ALJ was not required to investigate every aspect of T.H.'s functioning after the latest evidence in the record before him. *See Johnson v. Barnhart*, 449 F.3d 804, 808 (7th Cir. 2006) (stating that "a pro se litigant bears some responsibility for making a record"). But given his knowledge of her condition, the ALJ failed to make a reasonable effort to ensure that the documents that Plaintiff provided adequately reflected T.H.'s current functioning.

An ALJ's failure to adequately develop the record does not require remand unless a significant oversight is at stake. *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994); *see also Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997) ("In other words, the omission must be prejudicial."). That is the case here because the 2013 IEP shows significant changes to T.H.'s school functioning that run counter to the ALJ's assessment of her earlier records. The ALJ placed significant emphasis on the fact that T.H. was only removed from regular classes 17 percent of the time under the March 2012 IEP in order to receive 300 minutes per week of specialized services for math. (R. 32.) He concluded that T.H. was therefore able to "meet expectations" and "has been meeting her goals." (R. 33.) Had the ALJ obtained the 2013 IEP, he would have discovered that T.H. was now being removed from general education classes 62 percent of the time for special services in language arts, math, biology, and social sciences. That constitutes over a 360 percent increase in T.H.'s need for a more restrictive educational environment in a broader range of school subjects. *See Beth B. v. Van Clay*, 282 F.3d 493, 498 (7th Cir. 2002) (noting that the

IDEA requires that children with disabilities be placed in the least restrictive environment to the "'greatest extent appropriate'") (quoting 20 U.S.C. § 1412(5)). Far from showing that T.H.'s 2012 IEP had adequately accounted for her school functioning, such a dramatic increase in the need for a special educational setting suggests that the 2012 IEP was not the most reliable index of T.H.'s functioning vis-à-vis non-impaired children her age. Indeed, the new 2013 IEP states that T.H.'s earlier educational setting was "found not sufficient to meet [her] academic needs." [Doc. 15, Ex. A at 15.]

In addition to a more restrictive environment, the 2013 IEP also added new modifications to T.H.'s classroom settings and the requirements that were expected of her. The additional time that she was given to complete class and homework assignments was extended from 25 and 20 percent, respectively, under the March 2012 IEP to 50 percent each under the March 2013 IEP. She was also given preferential seating near her teacher for redirection, prompts, and cues. These were critical criteria that the ALJ was obligated to consider. Social Security Ruling 09-2p emphasizes that "[t]he more help or support of any kind that a child receives beyond what would be expected for children the same age without impairments, the less independently the child functions, and the more severe we will find the limitation to be." SSR 09-2p. Without knowing that T.H.'s need for support and modifications had increased during the 2012-2013 school year, the ALJ was unable to assess how her functioning progressed over time. That was crucial to the ALJ's decision because the "whole child" approach to childhood disability claims requires

an ALJ "to consider the effects of the impairment(s) longitudinally (that is, over time) when we evaluate the severity of the child's limitations."  SRR 09-1p.  By not obtaining the 2013 IEP, the ALJ did not have an opportunity to consider what T.H.'s need for increased support and modifications signified about how she was performing over time relative to non-impaired children her age.  Therefore, remand is required so that the ALJ can consider the full record and explain more carefully the restrictions that apply to T.H.'s domains of functioning.

     **D.**     **<u>Attending and Completing Tasks</u>**

In the domain of attending and completing tasks, an ALJ considers "how well you are able to focus and maintain your attention and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them."  20 C.F.R. § 416.926a(h). Attention concerns a child's level of alertness, ability to filter out distractions, and capacity to change focus when interruptions occur.  20 C.F.R. § 416.026a(h)(1)(i). Examples of limited functioning that could be either marked or extreme include being easily startled, being slow to complete activities, being sidetracked from tasks or easily frustrated, and needing extra supervision to complete tasks.  20 C.F.R. § 416.926a(h)(3)(i)-(iv).

The ALJ found that T.H. had a less than restricted limitation in this functional domain without considering the 2013 IEP.  But even based on the record before him, the ALJ engaged in reasoning that did not always involve the standards that apply to a child disability analysis.  For example, the ALJ placed great

emphasis on his belief that T.H.'s difficulties in paying attention adequately improved once the terms of the 2012 IEP were implemented. He explained that the comments of T.H.'s teachers concerning her limited attention were not unduly significant because they were made during the 2012 IEP's formulation and that, and once its terms were put in place, T.H. showed that she was "capable of learning and progressing." (R. 33, 38.) The fact that T.H. may have functioned better after the 2012 IEP was put in place only shows that her school performance improved in relation to earlier stages of her own development. The "whole child" standard requires the ALJ to examine how she functioned relative to her non-disabled peers. "The functional equivalence rules require us to begin by considering how the child functions every day and in all settings *compared to other children the same age who do not have impairments*." SSR 09-1p (emphasis added). Comparing T.H.'s school performance after the 2012 IEP to her performance prior to it does not address that issue. As several courts have noted, a child can improve under an IEP and still fall significantly behind non-disabled children her own age. *See A.H. ex rel. Williams v. Astrue*, No. 09 C 6981, 2011 WL 1935830, at *11 (N.D. Ill. May 18, 2011) ("Presumably, a child with serious limitations could show a measure of progress and still fall within the marked or extreme functional categories compared to other children her own age."); *Edwards ex rel. L.T. v. Colvin*, No. 12 C 7639, 2013 WL 3934228, at *12 (N.D. Ill. July 30, 2013) (noting that "courts have rejected an ALJ's reliance on improvement alone as a substitute for analyzing the child's actual functioning").

Along similar lines, the ALJ thought that T.H.'s increased intake of Ritalin was significant because it improved her school performance and reflected "some progress in reaching the optimal dosage and the claimant's stability on the medication." (R. 33.) Yet the fact that T.H. may have improved on Ritalin does not address how she functioned compared to children her age who do not take that medication for ADHD. "A child can improve with medication and still have profound limitations." *Edwards*, 2013 WL 3934228, at *12. Nor is the fact that T.H. might have been stable on Ritalin necessarily evidence that she was not more limited than the ALJ thought was the case. Courts have repeatedly found that "a person can have a condition that is both 'stable" and disabling at the same time." *See*, *e.g.*, *Hemminger v. Astrue*, 590 F. Supp.2d 1073, 1081 (W.D. Wis. 2008) (citing cases). The record strongly suggests that T.H. continued to have significant problems compared to her peers even after she increased her dosages of Ritalin. A NICHQ Vanderbilt Assessment Scale was issued for T.H. in 2013.[3] The assessment identified eleven areas in which T.H. "very often" had problems compared to other children her age. These included paying attention to details, sustaining attention, failing to follow through with instructions, avoiding tasks that required sustained attention, and interrupting others. (R. 154.) The ALJ noted some of these assessments, but he provided no explanation of why they were consistent with a

---

[3]  The NICHQ (National Institute for Children's Health Quality) Vanderbilt Scale assesses ADHD behaviors for children between the ages of six and twelve. *See* htttp://www.nichq.org/chidlrens-health/adhd/resources/Vanderbilt-assessment-scales (last visited April 27, 2017).

conclusion that T.H.'s restriction in attending and completing tasks was less than marked.

The ALJ may have thought that he complied with the "whole child" standard by pointing out that T.H. was promoted to the next grade level during the 2012-2013 school year along with her peers. Standing alone, however, that leaves key issues unresolved. The 2012 IEP implemented multiple accommodations for T.H., including separate seating, prompts and cues, additional time for exams and home work, and extra instructional examples. (R. 179-80.) The ALJ overlooked all of these accommodations even though the Ruling that governs the domain of attending to and completing tasks states that such modifications are potential indicators of serious limitations. *See* SSR 09-4p ("Despite the fact that the child is paying attention with prompting, this child is not functioning well in this domain."). The regulations emphasize that a child who receives special education accommodations cannot automatically be compared to non-impaired children because "good performance in a special education setting does not mean that you are functioning at the same level as other children your age who do not have impairments." 20 C.F.R. § 416.924a(b)(7)(iv); *see also A.H. ex rel. Williams*, 2011 WL 1935830, at *12 ("Satisfactory grades awarded to special education students receiving support and modifications cannot automatically be equated to the grades of nonimpaired children[.]"). The fact that T.H. was promoted to the next grade with her non-disabled classmates does not in itself reflect how she compared to their level of functioning. Instead of relying on T.H.'s promotion, therefore, the ALJ was required

to consider the degree to which she was able to pass to the next grade based on her IEP modifications.

Part of the problem with the ALJ's evaluation of this issue involves the potential overlap between the second domain of attending tasks and the first domain of acquiring and using information. The Rulings that apply to a child's six functional domains stress that a restriction in one area can affect the child's ability to function in others. *See, e.g.*, SSR 09-3p (stating that a child with restrictions in the ability to acquire and use information "may also have limitations in other domains"). In particular, "mental impairments that affect a child's ability to learn may also affect a child's ability to attend to or complete tasks." *Id.* Social Security Ruling 09-4p, which concerns the second domain, underscores the importance of considering the limitations that an ALJ has assessed in other functional areas:

> Therefore, as in any case, we evaluate the effects of a child's impairment(s), including the effects of medication or other treatment and therapies, in all relevant domains. Rating the limitations caused by a child's impairment(s) in each and every domain that it affects is not "double-weighting" of either the impairment(s) or its effects. Rather, it recognizes the particular effects of the child's impairment(s) in all domains involved in the child's limited activities.

The connection between the first and second domains was critical in this case because the ALJ cited the same grounds to support his conclusions in both functional areas – T.H. met her IEP goals, was promoted to the next grade, and improved on Ritalin. (R. 37.) Having conceded that the first two domains were inextricably intertwined, however, the ALJ provided no explanation of why the same facts meant that T.H. had a marked restriction in using information but only

a less than marked limitation in attending to tasks. It is difficult to understand, for example, why T.H.'s promotion to the next grade and her alleged ability to make progress under the 2012 IEP meant that she was more restricted in acquiring and using information – which SSR 09-3p clearly states involves a child's academic performance – than in attending to and completing tasks. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) ("[T]he ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review.").

The ALJ's silence on this issue is particularly troubling because in other parts of the decision the ALJ seriously underestimated the extent of T.H.'s intellectual challenges. As noted, Dr. Langgut concluded in 2010 that T.H.'s overall IQ score was 77 but that it had declined by 2012 to 68, thereby placing T.H. in the "extremely low range" of intellectual functioning. (R. 169.) Dr. Langgut had no doubt about the reliability of T.H.'s low 2012 score; he stated that it was "a valid indicator of her actual abilities at this time" and that it "most fully represent[s] [her] general intellectual functioning." (*Id.*) Contrary to that expert assessment, the ALJ stated that T.H.'s 2012 score was *less* reliable than the 2010 score because "ADHD was affecting her testing ability" in 2012. (R. 34.) The ALJ cited no medical evidence for replacing Dr. Langgut's expert opinion with his own assessment of the issue. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Nor did he explain how he reached the unusual

conclusion that the functioning of a claimant who has a severe impairment should be evaluated based on evidence that preceded the impairment's onset. That implies that ADHD somehow masked T.H.'s true capacity instead of being an integral part of the challenges that she faced. Courts have firmly rejected such reasoning. In *Taylor v. Colvin*, No. 15 C 3176, 2016 WL 6774230 (N.D. Ill. Nov. 14, 2016), for example, the ALJ discounted a psychological assessment on the ground that the ADHD-diagnosed child was careless and gave up easily during the testing procedure. The court noted that such reasoning "amounted to the puzzling conclusion that, while [the child] suffered from ADHD, her low test results were suspect *because* she displayed the symptoms that are inextricably linked to her impairment. That is not only illogical, it defies established case authority." *Id.* at 7 (citing *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 702 (7th Cir. 2009) ("[W]e reject the ALJ's line of thinking that [the child] is to blame for his [school] difficulties, which are textbook symptoms of ADHD.")).

The "whole child" approach emphasizes the need to examine a child's functioning in all areas, including activities and behaviors outside a school setting. *See* SSR 09-1p ("Your activities are everything you do at home, at school, and in your community.") (emphasis omitted). The ALJ applied this standard by considering T.H.'s medical records and Plaintiff's testimony about how T.H. functioned at home. Unfortunately, the ALJ misconstrued the evidence before him on several key points. On February 12, 2012, Plaintiff took T.H. to her pediatrician Dr. Monet Laguerre for an ADHD assessment. Dr. Laguerre briefly noted that T.H.

"was able to complete all task[s] while in office." (R. 163.) The ALJ cited that as evidence that T.H. did not have a marked limitation in attending and completing tasks. (R. 38.) The problem with that reasoning is that the record does not indicate what tasks Dr. Laguerre asked T.H. to perform. They might have been simple or complex, few or many. Without any information on what T.H. did during her visit with Dr. Laguerre, the ALJ had no ground for citing the pediatrician's comment to find that T.H.'s limitation in this domain was less than marked.

As for Plaintiff's testimony, the ALJ claimed that she stated that T.H. helped with household chores when asked to do so. Instead of citing Plaintiff herself, the ALJ referred to a note in Dr. Langgut's February 10, 2012 report stating that T.H. helped with chores. Dr. Langgut did not indicate whether T.H. or her mother made such a comment, but even if Plaintiff made the statement, she made clear at the administrative hearing that matters had changed as T.H. grew older. Plaintiff testified that T.H. had significant problems in completing activities and tasks. She has extreme difficulty in going to bed; must be repeatedly reminded to clean her room and pick up clothes; and "doesn't want to finish or whatever." (R. 52.) Plaintiff also testified that T.H. throws her homework in the garbage, gets distracted while she is playing, and is so disruptive at school that Plaintiff had received two calls from the school during the week of the hearing. (R. 53-59.) Indeed, Plaintiff stated that T.H.'s behavior had become so uncooperative that "[s]he drives me crazy." (R. 52.) The ALJ's only consideration of these statements was to note that Plaintiff stated that T.H. sometimes refused to do her homework.

That fails to account for significant range of activities that T.H. was not able to carry out at home, thereby failing to draw a logical bridge between the record and the ALJ's finding that T.H. did not have a marked restriction in her ability to attend to and complete tasks. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant . . . evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

The ALJ's failure to consider the evidence properly, combined with an oversight of how T.H. functioned compared to non-disabled children her age, requires remand. Plaintiff's motion is granted on this issue.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment is granted in part and denied in part. Pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

**SO ORDERED.**                                    **ENTERED:**

**DATE:    December 6, 2017**          _____
                                        **HON. MARIA VALDEZ**
                                        **United States Magistrate Judge**